The next case for argument is 24-1094, Teva Pharmaceuticals v. Eli Lilly. We're ready when you are, Mr. Wright. Good morning, Your Honors, and may it please the Court. Your Honors, the District Court found that the jury could have credited testimony that the disclosed murine anti-CGRP antagonist antibodies could be routinely humanized, and that a poster would know they could treat headache, and that a jury could have credited testimony that all humanized anti-CGRP antagonist antibodies will treat headache, but the Court thought as a legal matter that it could not consider those antibodies for purposes of its written description or enablement analyses because they had not actually been humanized. The Court then compounded that legal error by taking into account expert testimony that was impeached and contradicted of the losing party's expert witness. Okay, can I interrupt you just because I read all the briefs, trust me. I just want to, this is a little in the weeds, but I need to understand it, which is, can you walk me through the steps here for making one of these antibodies? Here's how I understand it could have been well understood as of the priority date. One, you object mice with CGRP. Two, you gather the antibodies the mice produce. Three, you screen them for binding and antagonizing ability. And four, you humanize them. Is that right? So that is correct. Okay, and the District Court described a process a bit differently. So I want to, I guess, understand if you agree with her description or you think there's daylight between yours and hers. Because at Appendix 18 and 19, she describes four steps. One, in vitro assay to identify candidates. Two, test the best candidate antibodies in animals. Three, get the antibodies from the animals. And four, humanize them. Do you have any criticism of that description of the steps? I mean, I would say when she says find the best candidates, she's essentially describing what you might do if you are trying to find a drug candidate as opposed to merely practicing the invention. So I think I would take issue with that. But I want to step back because she's also describing what you would do if you wanted to create the antibodies as if these were claims to the antibodies themselves. And they're not. These are claims to a method of treatment using an already well-known class of antibodies. All a POSA has to do to practice this method of treatment is take an antibody that's already been identified as an anti-CGRP antagonist antibody and has already been humanized. She talks about test the best candidate antibodies. Is animal testing required? Some of your own experts seem to say it was. So is there any evidence in terms of how complex this testing would have been? So the evidence from our experts and from the inventors, which the jury would have been able to credit, was that this was not actually incredibly complicated. They're all processes that you set up. They don't require teams of people to be acting. Did they describe it as routine? Yes. Do you have any sites for me on that? I don't, Your Honor, because I honestly wasn't focused on this precise issue. We can get it to you. We can provide them. But this goes to one of the major problems in the case, though, which is that the district court treated this case as if it were like this court's cases or the Supreme Court's decision in Amgen in which the invention is actually the class of antibodies where the inventor is saying, I have come up with something new. There's a new class of antibodies where there's uncertainty in the evidence about whether all members of that class will work for purposes of the invention. That is not this case, as the district court itself agreed. If you look at what the district court said a jury could have found, a lot of those factual determinations actually support the plaintiff in this case, right? She agreed that, as I was starting to say, a jury could have found that you can routinely humanize these antibodies, and once they're humanized, a poster would understand that they all would work for purposes of the invention. That is a constructive— Part of your argument, I think, hinges on kind of the Hirschler-Anginomoto line of cases. Is that fair to say? Exactly right, Your Honor. And then how does this humanization step, though, fit into that sort of mix, using that as your potential framework, I understand, for setting up your argument? Yeah, what we would say is that when you look at cases like Hirschler-Anginomoto, what distinguishes those from the cases that the district court relied upon is that in those cases you have a well-known genus in the background, and the question is, will all members of that genus work for purposes of the invention? And so, as the district court agreed, a POSA— the jury could have found that a POSA would know that you could take the anti-CGRP antagonist antibodies, that well-known class, and routinely humanize them, and that the humanization would work, and that once you've done the humanization, they all will work for purposes of the invention. That makes this case just like Hirschler-Anginomoto, which we did cite to the district court, and the district court did not address in its decision below. Well, Anginomoto didn't have something like four identified promoters, and citing to articles that had another dozen promoters, so you had a lot of promoters, but in this case, don't you only have one identified, humanized antibody? So, Anginomoto did have more, but I think that's a difference, it's not a distinction. Hirschler only had one, for example. There's only a single steroid, and what the CCPA said in that case was that whatever other differences may exist between the steroids, for other purposes, for purposes of this invention, they'll all work, they'll all behave similarly. And that's our case, right? We identified antibody G1, that was enough to direct EPOSA to the class of antibodies. But I also want to make another point, too, which is, there was antibody 4901, which was disclosed in the face of the specification, right? This was an antibody that what we said in the specification was available for sale. We know that both Teva and Lily obtained antibody 4901. I'm sorry, was that a humanized antibody? It was a murine antibody, but the specification says there's antibody 4901, here's where you can buy it. The evidence was it was available for sale to EPOSA for just $250, and the specification then goes on. It says, in some embodiments of this invention, the antibodies are humanized. It explains why EPOSA would want to humanize the antibodies, so that they won't be rejected by the human patient. So your position, first, the humanization is also described in the specification, right? It is extensively described in the specification. And what about the 12 murine? I mean, do we put them in as representative because humanization was routine? Would that be your, is that your analysis, too, that there's not just one? There's not just one. There's at least 4901, which EPOSA could have obtained from the catalog. And then there are other antibodies that are described in the literature. And I think, thinking about this from a jury trial perspective as well, this jury heard extensively that Lily had successfully argued to the PTO that this class of murine antibodies was already well-known to EPOSA. They even got the evidence... I'm sorry, when they were arguing that this class was well-known, were they talking about the murine antibodies? Were they talking about the humanized antibodies? Or were they talking about both? So that would be the murine antibodies, the specification then says, you should humanize these, and here's how to go about humanizing them, right? And so under, we believe under this court's precedence, that we've cited to the district court, in our brief, those all should have been taken into account. That is exactly the kind of information that EPOSA would be looking at in deciding, does this inventor have possession of what they're claiming, which is the class of... A different way of saying this was, it was obvious how you would get the humanized antibodies? It's not obvious, Mr. Honor. I know they argue obviousness, but this is not a case where there's some limitation missing from the specification, and we're trying to argue that EPOSA would have thought that limitation was obvious. Here we had antibody G1, right? We actually took an antibody all the way through. And what this court has said in cases like Immunex versus Sandoz that we discussed in our brief, is that a district court commits error if it does not look, if it does not consider what EPOSA would have considered outside the four corners of the specification. But here we don't even have to rely upon information outside the four corners, because the specification does point to literature which describes anti-CGRP antagonist antibodies. It does identify 4901. It does point to and explain how to humanize them, and it tells EPOSA why they would want to humanize them for purposes of the invention. Does it make any difference to you that, or should make any difference to us maybe, that there I think are three epitopes, if I'm using the right word, your antibody was one of the three, Lilly's was involved with a different one of the three, and yet because you have the one, you get to claim all three? So that does not make a difference, Your Honor, because what the district court agreed was that EPOSA would be aware from the prior art of antibodies binding to all three epitopes. This was at the court's decision at page A28. And there was evidence in the record of antibodies that bind to all three epitopes, and the district court agreed that EPOSA would understand that all members of the class would work for purposes of the invention. So the binding spot did not matter. And I can provide the court the references to the three epitopes. But there's an important point here, and this goes again to the jury trial issue, which is that one of the epitopes is the mid-region epitope. Lilly made a very big deal at trial about the fact that supposedly the prior art did not disclose a mid-region epitope anti-CGRP antibody. Their expert said that several times, and that was disproven on cross-examination. That was one of many instances in which their expert's credibility was undermined. And once you discredit their expert on issues like that, on issues like how EPOSA would go about trying to develop these antibodies, right, his theory was this random substitution theory. And there was extensive contrary testimony that you would not do random substitution, you would use this murine process. They really didn't have a clear and convincing case that the number of antibody candidates would be extraordinarily large, or that the genes would be extremely large. So this would be the testimony of one of our experts, Your Honor. If you look at Record Appendix 4174, our expert explained we'd expect that if one anti-CGRP antagonist antibody works in the closed perennial window, then you would expect them all to work. He put in similar testimony at 4272. This is the testimony that the district court cited when drawing that factual finding. And then there was additional testimony that the closed perennial window is a test that's predictive of the ability of a drug to reduce headaches or migraine in humans. And how would you address the statement, I think they rely on regents for some of their arguments, how would you respond or address that portion of regents that talks about describing a method of preparing a cDNA is not enough to satisfy a written description? Is it just that DNA or cDNA would be a special case, or how do you respond? Yeah, I mean that was a case where there was no ability to get from rat cDNA to human cDNA. It was certainly not routine to get from rat cDNA to human cDNA. Whereas here the evidence was that it was routine, again including Lilly's own statements to the PTO, that it would be routine to get from a murine antibody to a humanized antibody. That was essentially, it was not, that was their theory at the PTO. They won on that theory. I want to focus on, go ahead Your Honor. I was going to say, what do you think is the best case going your way on enablement? I feel like we talked a lot about re-description. I want to make sure before you sit down, you. Yeah, I think the key point for us on enablement is if you look at the Supreme Court's decision in Amgen, what it's really focused on is a novel body of genus of antibodies, where there's uncertainty whether it will all work for purposes of the invention. And that's what they've claimed. And that's what they've claimed. That's the novel aspect of the invention. And so our best case would be all this Court's cases in which it said that what you have to enable is the novel aspect of the invention. Here the novel aspect is not the underlying class of murine antibodies. That was well known. It was not humanization. That was routine. It was the use and headache. That is all the claims of these patents cover. That's exactly what we invented. That's exactly what we claimed. It's all that we claimed. And so we should survive the enablement test. So maybe this is related, but I'm not clear on why you're disputing whether it's large or not large. Because even if it's large, assuming I think it's very large, why does that matter, your ability to satisfy enablement, if we also accept it's true that every one of those antibodies works for treating headaches? We think we can win too. I think our point there is that their argument, and they have the burden to prove by clear and convincing evidence, depends upon it being large. And in part because of the deficiencies with their expert and the incredible theory that he relied upon, that even the jury thought was not credible at summary judgment, they simply did not meet their burden to prove here, especially to overcome JMOL. So it sounds like you're raising two independent arguments on enablement. Is that fair to say? The two arguments would be that they didn't necessarily show that the number of candidates was very large, and they also did not show that the number of antibodies within the genus was especially large. As the district court said, the jury might have found that it wasn't necessarily large at all. Maybe it wasn't necessarily small, but it wasn't necessarily large. But even if you're wrong or we don't agree with you on that, we have a second argument. Yes. And that second argument, just to get it clear on the record, is what you told us about the inventive aspect and the focus needing to be there, correct? The inventive aspect is that all members of the genus will work for purposes of treating headache. And so whether that's a large genus or a small genus, we've established through the testing that's disclosed in the specification, as opposed to what I understand it, based upon our expert's testimony, that all of them will work. And that's what sets this case apart from the enablement cases that the district court and Lilly rely upon. Just to restate it, because the class itself was well-known and creating members of the class was routine. Yes, Your Honor. And that makes this case like a genomoto, where the court said, look, it's a well-known class and you can routinely generate these things, as opposed to it wouldn't know how to do it. So just at the risk of redundancy, the representative species here includes not only what your inventor has invented, but also the rat antibodies? It would include the rat antibodies because the specification says take those antibodies, humanize them, and here's how to humanize them. So those are, opposed to reading that, would understand that those were members of the genus. Is there a case where this court has said the representative species can include something that's not actually a species and what's claimed? You know, I think probably the closest case that we cite in the briefing would be this court's decision in I'm completely blank. Oh, sorry. Would be this court's decision in Streck, which is the case involving the reticulocytes, where, at least as we read the case, there were reticulocyte analogs, there were true reticulocytes. The specification only had a reduction to practice with reticulocyte analogs, but what the court basically said in considering the written description question was that because true reticulocytes were well-known to and, of course, would understand that they also would work for purposes of the invention, then those would be taken into account for purposes of written description. But I also don't want to keep losing track of 4901 because 4901 was disclosed in the face of the specification. The specification said you could humanize it and it'll work. They had the burden of proof by clear and convincing evidence. They put in nothing about 4901, even though it was discussed extensively by the inventors and by our experts, and so a jury could have taken that into account concluding they failed to meet their burden of proof. And as far as anybody's 4901 goes, you would say that is disclosed as a representative species because it's a rat antibody that's in the specification, and the specification describes how you would go from having that rat antibody to having a humanized antibody for the 4901. Agreed, Your Honor, and also the specification, if you look at it, also discusses extensively experiments that were run with 4901. For example, it shows that both 4901 and G1, the humanized antibody, would work in the saphenous nerve assay, which is one of the tests they ran to see what is an anti-CGRP antagonist antibody. So a POSA looking at the specification would be very interested in 4901, which was available for public sale quite cheaply. Thank you, Your Honors. Let's just do our rebuttal time. Before the clock starts running, just let me get a clarification. You had marked on time for rebuttal, responding to the cross-appeal. Everything on 1-12, Your Honor. Okay, well, we may not see it that way, but you plan to cover your cross-appeal. We're going to waive the cross-appeal. We want to focus exclusively on the 1-12 issue. You're waiving the cross-appeal in terms of the challenge to the amount, or you're waiving your argument on all of it? The whole thing. We forfeit our argument on the cross-appeal. We withdraw it. Are you dismissing the cross-appeal? We are dismissing the cross-appeal, yes. Oh, so we don't need to decide the cross-appeal is what you just told us, correct? Correct. Okay. Please proceed. Thank you, Your Honor. I think I want to start with the District Court's finding that the jury could not have found that the inventors were in possession of an anti-CGRP antagonist antibody that could bind to all three regions of CGRP. And that is an exceedingly well supported statement. All of the antibodies in Tevis specification bound to the C-terminal region of CGRP, the C-terminal end. Antibody 4901 is tested in Tevis specification. It also binds to the C-terminal region of CGRP. Teva attempted to make antibodies that bound to the mid-region of CGRP, which is what Lilly's antibody binds to, and they failed. They said, objective not achieved. That's at appendix 24062. Eight years after filing their patent application, they attempted to make antibodies that bound to the N-terminal region of CGRP because they had failed previously. And what did they write? They wrote, how to do this? That's at appendix 5192. So there's nothing in Tevis specification that points to possession of the genus of antibodies that binds to the mid-region or the N-terminal region of CGRP. Now, they made quite a bit of discussion in their time that the antibodies aren't the invention. This is a one-step method. This is a claim directed to a method of using humanized anti-CGRP antagonist antibodies. And cases like Ariad and Rochester v. Searle tell us that regardless of whether a compound is claimed per se or a method is claimed that entails the use of the compound, the inventor cannot lay claim to that subject matter unless he can provide a description of the compound. And that's what they did and not do. And so what they're doing now I mean, you just did a double, I felt like I heard a double negative. Can you just restate what you were saying? Because I want to make sure I understand what you're saying. They need to demonstrate possession of the compounds claimed in their method. That's the law. I think you meant to say did not do. And can you tell me what you meant to say that they did not do? Teva did not demonstrate possession of antibodies that bind to the mid-region or the N-terminal region but they claimed them. They're encompassed by their claims but there is no description of that invention. And I'm sorry, which two cases did you say have that requirement? Ariad that's 598F3 at 1355 and Rochester v. Searle. Ariad was a composition. It was a method of using a composition. And so the point was that the particular class of molecules that were recited in that method were not adequately described and that was sort of the core. But here wasn't the class well known? Yeah, we disagree that the class of molecule that they claimed was well known because there were no humanized anti-CGRP antagonist antibodies that existed in the prior art. Do you agree that it was routine to humanize them from the murine antibodies? I think that if you knew the sequence of the murine antibodies none of which were known, you needed to have the sequence in order to do the humanization. But it doesn't disclose the sequences of any of the murine antibodies. TEVA did not make that available to the public and none of the prior art references disclosed the sequences of the murine antibodies. That means that there's no structural information so you can't visualize what antibodies are inside the scope of the claim and outside the scope of the claim. What about the IPR and the statements made in the IPR proceeding? The claim to the class was struck down. It was obvious. Those statements were directed to the murine class of antibodies. That there was a well known class but there was never a statement in the IPRs that the structures of the members of that class were known or that the sequences of the members of that class were known. And that's the information that a person of skill in the art would need both to make humanized antibodies and to visualize the antibodies that are within the scope of the claim or outside the scope of the claim. So the critical thing for the purposes of description under Ariad and Juno and AbbVie is the structure of these antibodies. And that structure was not in the prior art. It was not well known and TEVA did not describe it in their patents. Let me talk a little bit about Ejinomoto which was a case that was referenced and Hirschler. So in Ejinomoto that's exactly right. There was a method disclosed but there were four examples of these potent promoters disclosed in the specification. There were 14 more disclosed in the prior art and there was a structure function correlation. So there was a consensus sequence that had been established and it was known that the closer the sequences were to that consensus sequence, the more active the promoter would be. So there was a known structure function correlation. That's exactly what's missing here. Because there was no structural information whatsoever there was no ability to determine to visualize or recognize which antibodies were within the scope of the claim and which antibodies were not within the scope of the claim. Doesn't our case law support up that you don't need to disclose the structure of what's known in the art? I think in some instances for example if a technology is particularly predictable that may be the case. But here again the underlying fact is that the structures of these antibodies, the sequences of these antibodies were absolutely unknown. Just to follow up to what Judge Cunningham said in EuroPEP, Judge Bryson said exactly that. If the genus is well understood in the art and not itself the invention is instead a component of the claim, background knowledge may provide necessary support. In EuroPEP the specification disclosed the chemical structures of 10 different PDE5 inhibitors, the class of compounds. There were over 100 different structures reported in the prior art, including the accused product. So the accused product was actually in the prior art. This is a fundamentally different situation. Well you're saying because you can't humanize without the sequence. But weren't the sequences obtainable if you just procured the antibodies? Potentially but that just... Is that a yes? I mean yes. If you assume that you could procure the antibodies then you would get sequences. That's just a research project. That's the work that... That's routine. I think when you layer I think for doing it for an antibody it's routine but when you layer in the incredible scope of what they're attempting to claim. And I guess the other point that I would make when we talk about the well-known class of antibodies the facts are undisputed that there are only 6 or 7 such murine antibodies that existed in the prior art. That's just a tiny corner, even if you did obtain those antibodies and even if you did sequence them, that's just a tiny corner of the incredible scope of what Teva is claiming. So I think that that's... Why? Because the numbers are so large? Because the numbers are so large. This was the situation Your Honor, in Juno for example, where there was one of these particular antibody types in the specification and there were I think 4 or 5 more known in the prior art. The court said that's not good enough. That's just a tiny piece because you're claiming functionally. What if we accept the other side's argument that they've got one disclosure of the human eyes. They've got, and we accept, his argument about 4901 and about the 6, the 12 murine antibodies. You argue against that in your brief. What if we say yes to that? I didn't see your brief argue even if that's the case, it's still insufficient. I mean that certainly would still be insufficient for written description. And when did you argue that in your brief? I will ... Sorry to take your time. So if you look at red brief pages 49 to 50 the argument is they fail at rodent antibodies. They confirmed, Dr. McDonald confirmed that no sequence or structure was known for the rodent antibodies disclosed in Teva's specification of the prior art. Teva's experts similarly acknowledged that none of the sequences were known. And so this contention that they need not disclose ... That's my question. I understood this to be with respect to the 12 murine antibodies. But let's assume that we disagree with that. I didn't see another argument which is even if they were disclosed, the disclosure was insufficient. Did you make that argument? I don't have the site at my fingertips. My recollection is that we additionally argued that the limited number of species that would be available simply is not enough. In the AbbVie case where there were 300 antibodies disclosed, that wasn't enough. Because the antibody, essentially there was an infringement there, was so functionally different. Which is exactly the case here. In the Amgen case, there were 26 different species. That was not enough. Here, you have fewer examples that were in the prior art. And moreover, you have this possession problem of them not being able to make antibodies that bound to the mid region or to the end terminal region like Lily's antibody. So there's this extra layer of complication. I'd like to turn to their statements about the credibility of Lily's expert. So Lily's expert offered the opinion that the potential scope of antibodies in the genus claimed by Teva was exceedingly large. 10 to the 78th power of antibodies. And this was consistent with a slide from Teva's inventor on the potential diversity of antibodies. This is at Appendix 18012. There is no contrary testimony on the number of candidate antibodies potentially within the scope of the genus. And so the court, the district court, concluded that the jury could only have found that the number of antibodies needed to be screened was large. And that the size of the genus was unknowable. Do you think the novel aspect of the invention is using the class of antibodies to treat headaches? I think it's the antibodies themselves. It's the entire scope of the claim. I thought that we've already established, though, that it's the method of treatment claims here, right? It's not just a claim to the antibodies. The claim is a method of treatment. But under Ariadne and under Rochester, if you're claiming if the method is claiming a genus of compounds you need to adequately describe the compounds that are part of what you're claiming. Methods for treating headaches. That's what this invention is. No. It's a method of treating a headache of using a genus of compounds that was not adequately described or enabled. There are a few extra in there that are not adequately described or enabled. Are you arguing the patent suit did not enable the method of treatment if the class of antibodies itself is enabled? Yes. That is also our argument. What's your basis for that argument? The core of the argument is that you can't make predictions from antibody to antibody. That testimony is undisputed. Consequently, you have this incredibly large genus of antibodies and you have to make and test each antibody empirically to determine whether or not it's a member of the class. Given the amount of time that's involved and the amount of work that's involved in doing that, where their witnesses testified that to do the mouse method is quote, not very quick. It takes four months. That's Appendix 3391. Their expert testified that you do need to do testing on animals to determine what are good candidates. The concern I have is that we have a jury verdict here. If we didn't have a jury verdict, we'd be in a different place. If the jury verdict were in your favor, we'd be in an entirely different place. Just because you have some testimony that supports what you're saying here today is not sufficient. You get that, right? I do understand, but I think taking every assumption favorable to Teva, I think if you look at the whole of the evidence, the evidence is that you cannot predict which antibodies are going to work in the method and which antibodies aren't going to work in the method. That is fundamentally an enablement problem when you have a very broad genus, which is what Teva has here. All the testimony that we're citing for that is Teva's expert, Appendix 4257, Teva's inventor, Appendix 1407, where they say that you have to do the experiments. You have to make and test each of these antibodies to determine whether or not they work. And then the question, taking everything you said is given, the question is, experimentation is not a problem unless it's undue experimentation, right? So is there testimony on undue experimentation? There is testimony on undue experimentation. Is there testimony on the other side by Teva's expert that undue experimentation is not required? Yes, I don't think Teva's expert conceded it, but they do concede that in order to know which antibodies work, that you need to do the experimentation. And when you have to do experimentation for a class of antibodies that's this large, where there's so many antibodies, potentially within the scope of the claim, by law under Wyeth and Idenix and Amgen, that constitutes undue experimentation. Thank you. Thank you, Your Honors. So to respond to some of the points made there, my brother started off by arguing about whether we had possession of antibodies to all three epitopes. With the evidence, two points here. There's an evidentiary point, which is that the inventors testified that at a certain point they stopped attempting to make additional antibodies because they already had a good candidate. This is not pure science. These are companies. They don't do research. They don't need to. In addition, that entire argument ignores constructive possession. And again, the district court found that a poster would have understood that there were antibodies disclosed in the prior art that bound to all three epitopes and that once they were humanized, they all would work for purposes of the invention. There was a discussion. He said something about there only being six or seven rat antibodies in the prior art that were known. Do you agree with that? I don't. His expert pointed to a few different pieces of literature and said in these pieces of literature, in these four pieces of literature, there are six disclosed. But for example, there was a discussion, extensive discussion across multiple witnesses of the TAN prior art literature, which disclosed I think over 11 antibodies. Is that the graduate student? That was the graduate student. That's one of the aspects of this case, too. These are not antibodies like in Amgen where you have multi-billion dollar corporations pouring resources into finding the one antibody that will hit the sweet spot. These are antibodies that a graduate student can make using a mouse. And they were freely sharing them before the priority. They were just giving them away because no one actually really cared about the antibodies themselves. What is important about this case is the novel method of treatment that we came up with. That's what's the drug. That's why we're having the fight here today. And that's exactly what these particular patents claim. There was an argument made about knowing the sequences. And if you don't know the sequences, what can you do? Well, I would point this court, as we do in our briefs, to Enzobiochem versus GenProbe. If the material is out there and a poster has access to it, then they can sequence it. And that was the case, for example, with 4901, which they just ignored in front of the jury. And the jury could have taken that into account. At Jinomoto, there was a discussion about the number of species and whether the species there had a common structure. As we point out in our brief, Jinomoto actually had two different pieces of its analysis. One was representative number of species. One was common structural feature. When it came to representative number of species, there was not a discussion about any kind of common structure. There, the court simply looked at what was disclosed in the specification about numbers, what was known to OPOSA, and decided that enough was disclosed. And you're only going with representative species, right? We're only going with representative species, Your Honor. In Hirschler, there, again, only one was disclosed. And the important point in Hirschler was that despite the fact that only one was disclosed, OPOSA, looking at that, would understand if that one works, then whatever the variety of the genus is for other purposes, they'll all work for purposes of this invention. And that's exactly what the district court found. The jury could have concluded here. The size of the candidate pool, every time... Oh, sorry, Your Honor. One sentence more. Okay. So every time my brother referenced the large size of the antibody pool with the genus, he was relying upon Dr. McDonald's testimony, which, as we point out in our brief, was, of course, contested by our people. Thank you. Thank you. We thank both sides. The case is submitted.  Is there a district court... Gentlemen, could I have your attention? Do you want to file, just for our record-keeping purposes, a motion to dismiss the cross... We'll do so, Your Honor. Thank you.